UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

RONALD L. WINDERS,
    Plaintiff

vs                                            Case No. C-1-02-459
                                                  (Weber, J.)

OHIO OPERATING ENGINEERS        (Hogan, M.J.)
FRINGE BENEFIT PROGRAMS,
    Defendant

---

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on the parties' cross-motions for judgment on the merits (Docs. 9, 10), and their respective responses (Docs. 11, 12).

**PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff Ronald L. Winders brings this action against Defendant Ohio Operating Engineers Pension Fund, erroneously named as the Ohio Operating Engineers Fringe Benefit Programs, alleging wrongful denial of benefits in violation of the Employee Retirement Income Security Act of 1974, (ERISA), 29 U.S.C. § 1001, et. seq. Plaintiff's father, Ronald D. Winders, was a participant in the Ohio Operating Engineers Pension Plan (the "Plan"). (JR-0095). Plaintiff asserts that Defendant ignored the terms of the plan in order to deny Plaintiff's claim for benefits.

On June 29, 2001, Plaintiff's father completed an application for pension benefits under the Plan. (Doc. 8, parties' jointly filed agreed copy of the administrative record at 0094-97, hereinafter referred to as "JR-____). At the time of his application, Plaintiff's father was 61 years old, unmarried, and he applied for an Unreduced Early Retirement benefit under the Plan. (JR-0095-96). Following

the submission of his application, Plaintiff's father continued to work. (JR-00100). The record reflects that Plaintiff's father worked 224.50 hours in June, 2001 and 40 hours in July, 2001 prior to his death on July 11, 2001. (JR-0100, 0147).

On July 6, 2001, the Fund Administrator notified Plaintiff's father that his application had been received. (JR-0112). The letter stated that "[i]t normally takes approximately 60 days to obtain all the information needed to calculate the benefits." (Id.). Enclosed with the letter was a beneficiary card which Plaintiff's father was asked to complete. (Id.). Additionally, because the Pension Department records indicated that Plaintiff's father was married previously, he was asked to provide either a divorce decree or a death certificate for his former wife. (Id.). In addition to the beneficiary card, Plaintiff's father would have also been asked to select the form of the pension payment which he sought to receive, namely whether he wished to elect a Life Annuity or Contingent Annuitant. (JR-0087-0090). The application form which Plaintiff's father completed permitted him to apply for a Life Annuity or Contingent Annuitant benefit, however, Plaintiff's father did not make either selection at that time. (JR-0095).

On July 11, 2001, Plaintiff's father died before completing any forms beyond the initial application. (JR-0092). On July 25, 2001, the Plan Administrator notified Plaintiff that the surviving children of Ronald D. Winders "will divide equally a lump sum payment of ... $85,795.10." (JR-0092). Plaintiff challenged the decision to allow only a lump sum payment in a letter dated September 8, 2001 and questioned why the "60 payment rule" was not applied in his father's case. (JR-0150). The Plan Administrator referred Plaintiff to Sections 7/03 and 7.05 of the Plan and informed Plaintiff of his right to appeal the decision. (JR-0149). In a subsequent correspondence dated September 18, 2001, Plaintiff stated that he believed that he was entitled to the guaranteed sixty (60) month payment as his father had completed all the paperwork necessary for pension benefits. (JR-0147). On October 17, 2001, the Plan Trustees considered Plaintiff's claim but it was determined that Plaintiff's claim for additional death benefits should be denied because Plaintiff's father had not completed the pension application process. (JR-0166).

Thereafter, on November 20, 2001, Plaintiff's newly retained counsel informed the Plan that Plaintiff believed that his father "died after he had completed and filed the proper election forms for retirement and was indeed retired." (JR-0145). Defendant informed Plaintiff of the applicable Plan provisions

and the additional application forms which Plaintiff's father had not completed prior to his death. (JR-0159). Plaintiff now brings this action seeking death benefits in the form of the sixty monthly payments, namely a Life Annuity. (Doc. 1, Notice of Removal, Complaint, attached).

## STANDARD OF REVIEW

The United States Supreme Court has held that the *de novo* standard of review applies to an ERISA claim under § 1132(a)(1)(B) challenging the denial of benefits, unless the plan in question gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan does vest such discretionary authority with the plan administrator or fiduciary, the Court must apply the more deferential "arbitrary and capricious" standard. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). The highly deferential arbitrary and capricious standard "is the least demanding form of judicial review of administrative action" such that "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular decision, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995).

Plaintiff argues that the Court should apply the *de novo* standard of review because the plan language does not explicitly grant defendant the requisite discretionary authority to trigger a review under the heightened arbitrary and capricious standard.

In the present case, the Plan is a multi-employer trust fund established for the benefit of participants, their families and dependents. (JR-0001-JR-0005). The Plan is administered by the Plan Trustees and the Fund Administrator. (JR-0009, JR-0041). The Plan states in pertinent part:

> The Trustees or the Fund Administrator, if so directed by the Trustees, shall have such powers as may be necessary to discharge their duties to administer the Plan in their sole and absolute discretion. These powers shall include, but not be limited to, the following:

>    (a) to construe and interpret the Plan, decide all questions of eligibility and determine the amounts, manner and time of payment of any benefits hereunder;
>
>    (b) to prescribe procedures to be followed by Participants or Beneficiaries filing applications for benefits;
>
>                              ....
>    (d) to receive from any Employer and from Participants such information as shall be necessary got the proper administration of the Plan;
>
>                              ....

(JR-0041-0042). The Plan also permits the Fund Administrator to require participants "to complete and file ... an application for benefits and all other forms approved by the Trustees and the Fund Administrator and to furnish all pertinent information requested by the Fund Administrator." (JR-0043, § 9.04 of the Plan). It is clear that the policy grants the Plan Trustees and Fund Administrator discretionary authority to both determine eligibility for benefits and construe the terms of the plan. Consequently, the Court must apply the arbitrary and capricious standard to its review of Defendant's decision to deny additional death benefits.

## ANALYSIS

In *Wilkins v. Baptist Health Care System*, 150 F.3d 609, 615 (6th Cir. 1998), the Sixth Circuit set forth the procedure applicable to resolution of ERISA cases where plaintiff challenges a denial of benefits under § 1132(a)(1)(B). In such cases, the district court bases its review solely upon the administrative record and renders findings of fact and conclusions of law accordingly. *Id.* at 619 (Gilman, J. concurring, joined by Ryan, J.). The district court may consider the parties' arguments regarding the proper analysis of the evidentiary materials contained in the administrative record, but may not consider any evidence outside the administrative record unless such evidence is offered in support of a procedural challenge to the administrator's decision, such as lack of due process or alleged bias on its part. *Id. See also Washburn v. Unum Life Insurance Company of America*, 43 F. Supp.2d 848, 852 (S.D. Ohio 1998)(Dlott, J.)(*Wilkins* procedure governing ERISA cases applies whether applicable standard of review is *de novo* or arbitrary and capricious). *Accord Marchetti*, 30 F. Supp.2d at 1004; *Heffernan*, 2001 WL 1842465, at * 4.

<u>Claim Challenging Denial of Additional Death Benefits</u>

Under the arbitrary and capricious standard of review, the Court must determine whether Defendant's decision to deny Plaintiff additional death benefits was rational and consistent with the terms of the policy. *Eriksen v. Metropolitan Life Ins. Co.*, 39 F. Supp.2d 864, 870 (E.D. Mich. 1999)(citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991)). A benefit decision will be upheld under the arbitrary and capricious standard "'if it is the result of a deliberate principled reasoning process and if it is supported by substantial evidence.'" *Killian*, 152 F.3d at 520 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)); *Henderson*, 2001 WL 1823813, at * 6. *See also Marchetti*, 30 F. Supp.2d at 1008 (arbitrary and capricious standard requires court to uphold administrator's decision if it is rational in light of the plan's provisions and reasonable with no abuse of discretion); *Eriksen*, 39 F. Supp.2d at 870 (only when court is confident that the decision maker overlooked something important or seriously erred in appreciating the significance of evidence may it conclude that decision was arbitrary capricious).

The Court's analysis begins with Plaintiff's father's application for pension benefits. Plaintiff's father submitted his application for pension benefits on June 29, 2001. (JR-0094-0097). At the time of his application, Plaintiff's father was sixty-one years of age and unmarried. (JR-0095-0096). Plaintiff's father applied for an Unreduced Early Retirement benefit under the Plan. (Id.). By letter dated July 6, 2001, the Fund Administrator notified Plaintiff's father that his application for pension benefits had been received. (JR-0112). Plaintiff's father was also informed that the application process normally took sixty days to obtain the necessary information to calculate the benefit amount. (Id.). Plaintiff's father was given a beneficiary card to complete and was also requested to provide either a divorce decree or a death certificate regarding his former spouse. (Id.). Plaintiff's father, however, died before designating a beneficiary. Plaintiff's father also did not have the opportunity to choose the form of pension payment.

Plaintiff argues that his father satisfied all the requirements for a benefit to commence under Section 7.03 of the Plan such that Plaintiff, as his father's sole heir, is entitled to the Life Annuity form of payment, namely, sixty monthly payments. (JR-0035). Defendant, on the other hand, argues that Plaintiff's father merely initiated the application process and by no means satisfied all the

requirements by completing one form.  As such, Defendant contends that Plaintiff is entitled to a death benefit pursuant to Section 7.05 of the Plan, namely a lump sum equal to the amount of Employer contributions credited under the Plan to the participant at the time of his death.  (JR-0038).  The question before the Court is whether Plaintiff's father had satisfied all the requirements for a benefit to commence under the Plan.  We answer this question in the negative.

In addition to the application form, Plan participants are asked to complete the election of beneficiary form and to select a form of pension payment that the participant wishes to receive.  Due to his death, Plaintiff's father did not complete either of these forms.  Likewise, he did not submit a copy of his divorce decree as requested.

Article 6 of the Plan governs the form of benefit payment.  The general requirements for the payment of benefits, pursuant to Article 6, provide that:

> (a) General Requirements.  At the time a Participant becomes entitled to receive any benefit described in Article 5, the Fund Administrator shall either make payment from the Plan to such Participant (i) in the automatic form of payment described in paragraph (b) which is applicable to the Participant; or (ii) in one of the optional methods of payment elected by such Participant pursuant to paragraph (c).

(JR-0029, 6.01(a)).

Section 6.01 also provides for two distinct forms of pension payment: (1) a Life Annuity (a/k/a/ the "Normal Form"), 60 guaranteed payments; or (2) a 50% Contingent Annuitant Benefit ("Contingent Annuitant").  (JR-0012, 0029, 0087).  These two payment forms differ as to the death benefit a participant's beneficiary may receive and as to who qualifies as a beneficiary.  With respect to the Life Annuity, any individual designated by the participant may be a beneficiary.  (JR-0007, 0087).  In contrast, the Contingent Annuitant form dictates that only the participant's spouse, son or daughter, whether biological or adopted, may be designated as the participant's beneficiary.  (JR-007, 0087).  With respect to the amount of death benefit, the Life Annuity provides that the beneficiary of the death benefit receive the "remainder of the unpaid 60 payments or a lump sum certain."  (JR-0088).  The Contingent Annuitant provides that the beneficiary receive a death benefit "equal to 50 % of the monthly payments made to the participant during his

lifetime...." (JR-0030, 0087).

Article 6 also provides that "unless an optional form of payment is elected by the Participant ... within the 90 day period ending on the Annuity Starting Date, the benefit of an unmarried Participant shall be paid in the Normal Form." (JR-0029, 6.01(b)). Plaintiff argues that, because his father died before the 90 day period expired, he could not elect an optional form of payment and thus, the "Normal Form" of payment became applicable by default. We disagree. While the "Normal Form" appears to be a "default" form of payment, such default does not occur until the participant becomes entitled to receive any benefit and the 90 day period "ending on the Annuity Starting Date" expires. By definition, the Annuity Starting Date is the first day of the first period for which an amount is paid as an annuity. It follows, then, that for this annuity to be paid, it would have been necessary for the application for pension benefits to have been approved and Plaintiff's father to have actually retired. As his application was never approved, *and* he continued to work full-time following his application, it cannot logically be argued that Plaintiff's father was "entitled to receive any benefit." Thus, Plaintiff's father could not be considered to be retired but was rather, still an active Participant in the Plan at the time of his death.[1] The Summary Plan Description ("SPD") states clearly that, if a participant is not married at the time of his death, and is an active participant in the Plan, his beneficiary will receive a "lump sum payment of the nonforfeitable Employer Contributions credited under the Plan." (JR-0073).

Plaintiff asserts that Defendant's argument that his father was not retired because he continued to work following the submission of his pension application is inconsistent with the language of the SPD. Plaintiff attempts to create an inconsistency by arguing that such a requirement is "tantamount to requiring a retiree to cease all work upon submission of the retirement benefits application. Otherwise no scenario could exist where all 60 payments would remain unpaid because Defendant would not consider an applicant retired unless he either ceased

---

[1] While there is no definition for "retirement" or "actual retirement" as Plaintiff points out, Article 4 of the Plan provides that the payment of retirement benefits commences "on the first day of any month following the month in which the Participant's application for his normal retirement benefit is received *and approved* by the Fund Administrator." (JR-0020, Section 4.01). That Plaintiff's father's application was not approved at the time of his death is undisputed.

7

all work or began receiving benefits." Plaintiff's argument in this respect is fundamentally flawed by a misreading of the SPD language. Nowhere in the Plan's language does it state that a participant's estate will receive "at least 60 payments in the event of [the participant's] death, even if all 60 payments remain unpaid." Therefore, Plaintiff is correct that there is no scenario wherein all 60 payments would remain unpaid. Moreover, the language of the Plan does not even contemplate such a scenario. While, as Plaintiff contends, there is no provision in the Plan which requires participants to cease all work upon the submission of their pension application, there is likewise no provision classifying such applicants as retirees. As stated previously, because the payment of retirement benefits commences "on the first day of any month following the month in which the Participant's application for his normal retirement benefit is received *and approved* by the Fund Administrator," Plaintiff's father could not considered to be retired until his application was approved, at which time there would be ample notification to cease working and commence the receipt of pension benefits. (JR-0020, Section 4.01). Until such time, Plaintiff's father was still an active participant under the Plan. The question then becomes whether he was a participant who had satisfied all requirements for a benefit to commence under the Plan or was he a participant who died without satisfying all of the requirements for the payment of benefits under the Plan. (JR-0035, Section 7.03; JR-0038, Section 7.05))

In addition to choosing a form of payment, participants are required to select a beneficiary. Plaintiff's father designated his wife as a beneficiary prior to their divorce in 1979. (JR-0124). However, due to the divorce, the Plan did not consider the pre-divorce beneficiary designation to be controlling. (JR-0092, 0123). Because Plaintiff's father never completed the beneficiary card provided to him on July 6, 2001 (JR-0112), Plaintiff was deemed the beneficiary of his father's death benefit pursuant to Section 7.06 because his father died without a spouse and Plaintiff was the sole surviving child. (JR-0038, 00092, and 0122-0123). However, Section 7.06 applies only to the payment of a death benefit upon the death of an active participant. (JR-0038, 0073). If, as Plaintiff argues, his father had intended to choose the Life Annuity form of payment, he could have designated any "individual to receive any death benefit payable under the Plan." (JR-0007, 0087). As Defendant correctly points out, this individual can be a neighbor, friend, relative, minister, or even a girlfriend. (JR-0007, 0087). To state that the issue is moot because no beneficiary was designated and Plaintiff is his father's sole heir misrepresents the status of the application process. Certainly, this would have been the case, had Plaintiff's father died after completing the entire

application process yet having failed to select a beneficiary prior to his death. Under this set of facts, Plaintiff would have been entitled to benefits as provided pursuant to Section 7.03. However, to make this conclusion after only the initial application had been completed requires a premature assumption on the part of the Fund Administrator. If, as Plaintiff argues, his father intended to select the Life Annuity form of payment, Plaintiff's argument then assumes that he would have been named the beneficiary of his father's benefits under the Plan. Such an assumption is not supported by the administrative record in this case. Plaintiff's father had twenty-two years following his divorce in which to change his designated beneficiary to his sole surviving child but did not do so. It was entirely within reason for the Fund Administrator to refrain from making such an assumption.

While Plaintiff offers explanations for why it was not necessary for his father to complete the required forms, it is undisputed that the required forms were not completed prior to his father's death. Certainly, Plaintiff's argument has a rational aspect to it, when viewed posthumously. Nonetheless, Plaintiff's argument assumes a chain of events which cannot be corroborated. As such, we find that it was reasonable for Defendant to find that Plaintiff's father died without satisfying all the requirements for a benefit to commence under the Plan. Such a determination is, in our opinion, rational and entirely consistent with the terms of the Plan.

Plaintiff's assertion that Defendant was operating under a conflict of interest when it made the decision to deny him additional death benefits does not require a different result. As the Supreme Court noted in *Firestone*, *supra*, where a benefit plan gives discretion to an administrator who is operating under a conflict of interest, that conflict must be weighed as "a factor in determining where there is an abuse of discretion." 489 U.S. at 109. *Accord Killian*, 152 F.3d at 521; *Henderson v. Ameritech Corp.*, 2001 WL 1823813, at * 6 (6th Cir. Dec. 20, 2001); *Cochran v. Trans-General Life Ins. Co.*, 60 F. Supp.2d 693, 698 (E.D. Mich. 1999); *Marchetti v. Sun Life Assurance Co. of Canada*, 30 F. Supp.2d 1001, 1007 (M.D. Tenn. 1998); *Heffernan v. Unum Life Ins. Co. of America*, 2001 WL 1842465, at *2 (S.D. Ohio March 21, 2001)(Dlott, J.). Plaintiff cites this Court to *Darland v. Fortis Benefits Insurance Co.,* 317 F.3d 516 (6th Cir. 2003), for the proposition that an actual conflict exists when the Plan Administrator is the party that ultimately pays the benefit. *Darland*, 317 F.3d at 527. However, unlike the plan in *Darland*, the Fund Administrator, as an individual who is appointed by the Trustees, is not the

party that ultimately pays the benefit. The Plan in the present case is a multi-employer trust fund that is established and administered pursuant to the ERISA and the Labor Management Relations Act of 1947, 29 U.S.C. § 185, et seq. ("LMRA"). As a multi-employer fund, the Plan is governed by both union and employer trustees. (JR-0061). Because the Plan is funded through employer contributions, which are calculated based on hours worked by participants, the decision of whether to approve or deny Plaintiff's claim for additional death benefits has no direct effect on the Plan's funding. (*See* JR-00010-00012). *See Killian*, 152 F.3d at 521 (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997) and *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998)). Moreover, Plaintiff bases his argument solely upon the fact that the Plan's decision meant that it would pay considerably less to Plaintiff than if it approved Plaintiff's claim for additional benefits. Such is not sufficient, in our opinion, to constitute an actual conflict of interest. If such were the case, then virtually every plan decision to pay a participant less money would result in a conflict of interest. Accordingly, we find no conflict of interest, actual, apparent or otherwise and conclude that Defendant did not abuse its discretion under the Plan in finding Plaintiff entitled only to a lump sum payment equal to the amount of Employer contributions credited under the Plan to Plaintiff's father at the time of his death.

**IT IS THEREFORE RECOMMENDED THAT:**

1)   Defendant's Motion for Judgment (Doc. 9) be **GRANTED**.

2)   Plaintiff's Motion for Judgment on the Record (Doc. 10) be **DENIED.**


Date: _____              _____s/Timothy S. Hogan_____
9/26/03                            Timothy S. Hogan
                                   United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RONALD L. WINDERS,
    Plaintiff

vs.                                    Case No. C-1-02-459
                                            (Weber, J.)

OHIO OPERATING ENGINEERS         (Hogan, M.J.)
FRINGE BENEFIT PROGRAMS,
    Defendant

## NOTICE

Attached hereto is the Report and Recommended decision of The Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on _____. Any party may object to the Magistrate's findings, recommendations and report within ten (10) days after being served with a copy thereof or further appeal is waived. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also* Fed. R. Civ. P. 72(b). Such parties shall file with the Clerk of Court, and serve on all Parties, the Judge and the Magistrate, a written Motion to Review which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made along with a memorandum of law setting forth the basis for such objections. (Such parties shall file with the Clerk a transcript of the specific portions of any evidentiary proceedings to which an objection is made).

In the event a party files a Motion to Review the Magistrate's Findings, Recommendations and Report, all other parties shall respond to said Motion to Review within ten (10) days after being served a copy thereof. *See* Fed. R. Civ. P. 72(b).

P:\HJW\02cv459R&R.wpd