UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RONALD L. WINDERS | : | Case No. C-1-02-459 |
| | : | |
| Plaintiff, | : | (Judge Weber) |
| | : | (Magistrate Hogan) |
| vs. | : | |
| | : | |
| OHIO OPERATING ENGINEERS | : | **MOTION FOR REVIEW OF** |
| FRINGE BENEFIT PROGRAMS | : | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION AND** |
| Defendant. | : | **OBJECTIONS TO SAID REPORT** |
| | : | **AND RECOMMENDATIONS** |

Now comes the Plaintiff, Ronald L. Winders, by and through counsel, and hereby moves this Court, pursuant to Rule 72 of the Federal Rules of Civil Procedure, to review the Report and Recommendation of Magistrate Judge Timothy S. Hogan, which Report and Recommendation was entered on September 30, 2003. Plaintiff requests review of said Report and Recommendation and objects to said Report and Recommendation. Plaintiff contends that the Report and Recommendation is erroneous in that it recommended that Defendant's Motion for Judgment on the Record be granted and that Plaintiff's Motion for Judgment on the Record be denied.

A Memorandum in support hereof is attached hereto.

Respectfully submitted,


/s Randy J. Blankenship
Daniel J. Temming (#0030364)
Randy J. Blankenship (#0034594)
Attorneys for Plaintiff
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, OH 45202-2417
TEL:           (513) 721-3330
FAX:           (513) 721-5001
E-MAIL:        rblankenship@rkpt.com


/s Anthony J. Gertz
Anthony J. Gertz (#0008226)
Attorney for Plaintiff
Gertz & Gertz, L.P.A.
401 Pike Street
Reading, Ohio  45215
TEL:           (513) 554-1868
FAX:           (513) 554-1897
E-MAIL:        agertz@gertzlaw.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been furnished to Thomas M. Tarpy. Scott A. Carroll, and David A. Campbell, Vorys, Sater, Seymour and Pease LLP, P.O. Box 1008, 52 East Gay Street, Columbus, Ohio 43215-1006, by regular U.S. mail, postage prepaid, this 10th day of October, 2003.


/s Randy J. Blankenship
Randy J. Blankenship


sll\P:\RKPT\Data\wp\RANDY\L2728 0001 (Motion for Review).doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RONALD L. WINDERS            :        Case No. C-1-02-459
                             :
        Plaintiff,           :        (Judge Weber)
                             :        (Magistrate Hogan)
vs.                          :
                             :        **MEMORANDUM IN SUPPORT**
OHIO OPERATING ENGINEERS     :        **OF MOTION FOR REVIEW OF**
FRINGE BENEFIT PROGRAMS      :        **MAGISTRATE'S REPORT AND**
                             :        **RECOMMENDATION AND**
        Defendant.           :        **OBJECTIONS TO SAID REPORT**
                             :        **AND RECOMMENDATIONS**

I.    **INTRODUCTION**

The core issue presented is whether Defendant's decision to deny Mr. Winders' request for monthly Unreduced Early Retirement benefits was justified by the language of the Ohio Operating Engineers Pension Plan.  The Plan and the Summary Plan Description ("SPD") both require that Unreduced Early Retirement benefits be paid to Mr. Winders in sixty (60) monthly installments.  Neither the Plan nor the SPD support the conclusion that Mr. Winders is entitled only to a lump sum payment.

Here, the Magistrate Judge erred in finding for Defendant.  This error stemmed from the Magistrate Judge's erroneous interpretation that arbitrary and capricious review, rather than *de novo* review, applied to the Plan Administrator's Decision.  Since the Magistrate Judge erroneously applied a highly deferential standard of review, the Magistrate Judge also reached an erroneous decision, finding Plaintiff was only entitled to one lump sum payment.

1

## II.    **STATEMENT OF FACTS**

Ronald D. Winders was a participant in the Ohio Operating Engineers Pension Plan.  (JR-0095).  Mr. Winders worked his last day as a member of Local Union No. 18 for Kokosing Construction on June 28, 2001.  (Id.).  Mr. Winders was born on April 22, 1940.  (Id.).  Thus having reached the age of 61, Mr. Winders elected to take Early Retirement, as permitted under the terms of the Pension Plan, by submitting an Application for Pension Benefits on June 29, 2001.  (JR-009420097).[1]  The "Instructions" section of the Application form informed Mr. Winders of what he needed to do to complete his request for pension benefits.  (JR-0094).  As reflected in the submitted Application, Mr. Winders followed those instructions in completing his Application.  In response to question number 4 on the Application, Mr. Winders indicated that he was applying for "unreduced early retirement, age 61 but prior to age 65."  (JR-0095).  He signed the Application in the presence of a notary public on June 29, 2001.  (JR-0097).

By opting for "Unreduced Early Retirement," Mr. Winders sought Pension Benefits under Section 5.02(b) of the Plan.  That Section provides:

> (b)    A Participant who retires on or after the date on which he attains age 61, with Employer contributions for at least 300 Hours of Service and each of 30 Service Credit Years will be entitled to a **monthly** Unreduced Early Retirement Benefit, determined in the Normal Form.  The amount of a Participant's Unreduced Early Retirement Benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his **monthly** past service benefit (if any) and his **monthly** future service benefit as of the date of his Unreduced Early Retirement.

(JR-0025-0026) (emphasis added).

Mr. Winders, by electing Unreduced Early Retirement, specified that he wanted a monthly payment as reflected in Section 5.02(b), which clearly refers, in several provisions, to a

---

[1]    Paragraph 1.11 of the Plan specifically permits "Early Retirement" for any Plan Participant who has attained the age of 57 and has 10 or more years of Credited Service.  (JR-0008).

"**monthly** Unreduced Early Retirement Benefits."[2]   The conclusion that Mr. Winders had specified that he was to receive monthly payments, rather than a lump sum payment, is further compelled by the definition of "Normal Form" found in Section 1.19 of the Plan.  Under Section 5.02(b), "Unreduced Early Retirement" benefits shall not only be "monthly" benefits, but also shall be paid in the "Normal Form."  Section 1.19 defines the term, "Normal Form," as follows:

> "Normal Form" means an immediate 5 year certain and life annuity, **payable in monthly installments** on the first day of each calendar month **for 60 month certain** and thereafter on the first day of each calendar month in which the Participant has lived the entire preceding month.   **In the event of the Participant's death during the 60-month certain period, monthly payments**, in the same amount as those made during the Participant's life, **shall continue to the Participant's Beneficiary for the balance of such period certain**.

(JR-0012) (emphasis added).

Thus, by electing "Unreduced Early Retirement," Ronald D. Winders elected to receive monthly benefits under Section 5.02, payable in the "Normal Form" as defined in Section 1.19. The "Normal Form" definition means that such monthly payments were guaranteed for at least 60 months.   The conclusion that, in opting for Unreduced Early Retirement, Mr. Winders specified his pension benefit would be a monthly payment for a guaranteed 60 month period is buttressed by the Summary Plan Description ("SPD"), which states:

> **WHEN CAN I RETIRE?**
>
> Your Normal Retirement Date is the first day of the month following your 65th birthday.
>
> You may retire with an unreduced benefit:
>
> •     at age 62; or
>
> •     effective April 1, 1997, at age 61 with Employer contributions for at least 300 Hours of Service in each of 30 Service Credit Years.

---

[2]        Paragraph 5.02(a), which governs "Unreduced Early Retirement" when elected after age 62 also refers to it as a "monthly payment."  (JR-0025).

3

Case 1:02-cv-00459-HJW-TSH    Document 14    Filed 10/10/2003    Page 6 of 26

You may retire anytime between your 57th and 62nd birthday if you have completed ten years of Credited Service. If you retire before your 62nd birthday (or 61st birthday with the required Hours of Service), your **monthly** pension payments will be reduced, since your pension will start sooner. If you retire after your 62nd birthday (or 61st birthday with the required Hours of Service), your benefit will <u>not</u> be reduced.

(JR-0062) (emphasis added).

Similarly, page 16 of the SPD states:

**HOW WILL MY PENSION BE PAID?**

The normal form of payment for Normal, Early or Disability Retirement is a **monthly pension for your lifetime with a minimum of 60 payments guaranteed**. Under this form, **if you should die before you receive 60 monthly payments from the Plan, your beneficiary or your estate will receive the remaining unpaid installments**....

(JR-0072) (emphasis added).

Therefore, both the Plan and the SPD compel the conclusion that, by electing "Unreduced Early Retirement," Ronald D. Winders completed the Application, electing a payment form (i.e., a monthly payment), and that those monthly payments were to be paid in the "Normal Form," which means for a guaranteed term of 60 months.

As noted, Mr. Winders signed the Application on June 29, 2001 (JR-0098) and sent it to the Ohio Operating Engineers Pension Plan, which received it on July 2, 2001. (JR-0094). After its receipt of the Application, the Plan sent a letter to Mr. Winders dated July 6, 2001. (JR-0112). In this letter, the Plan acknowledged that Mr. Winders had elected to receive a monthly benefit by opting for Unreduced Early Retirement. The letter stated, in pertinent part, as follows:

"This will acknowledge receipt of your application for Pension benefits. It normally takes approximately 60 days to obtain all the information needed to calculate the benefits.

Enclosed is a beneficiary card for your completion and return to this office to ensure proper beneficiary information and other personal data.

4

> **If you are interested in having your monthly pension check sent directly to your bank for deposit, please contact our office for more information**.
>
> …
>
> If additional information is required, we will be in touch with you.…"

(JR-0112) (emphasis added).  Thus, the benefit calculation remained to be done, but Mr. Winders' application was accepted by the Plan.  Hence, he was "retired."

Moreover, by July 6, 2001, the Plan knew that Mr. Winders had selected a "monthly pension check.…" (Id.).[3]  Before he received any of his monthly pension benefits, Ronald D. Winders died on July 11, 2001.  (JR-0093).

On July 25, 2001, Ray Orrand, Plan Administrator, sent a letter to Mr. Winders' son, Ronald L. Winders, in which he stated that the surviving children of Ronald D. Winders "will divide equally a lump sum payment of … $85,795.10."  (JR-0092).  Ronald L. Winders challenged the decision to allow only a lump sum payment in a letter dated September 8, 2001.  (JR-0150).  In this letter, he stated:  "… I believe the 60 payment rule should apply since my father retired on July 29, 2001.  Please advise why the 60 payment rule was not applied."  (Id.).  By letter dated September 11, 2001, Mr. Orrand refused to reconsider his decision.  Mr. Orrand stated that the lump sum payment decision was supported by Sections 7.03 and 7.05 of the Plan.  (JR-0149).  Neither Section cited by Mr. Orrand, however, supports the determination that Mr. Winders was only entitled to receive a lump sum payment.  Section 7.03 states:

> Upon the death of a Participant who has satisfied all requirements for a benefit to commence under the Plan, including the completion of an application with the Fund Administrator in which a payment form is elected, prior to the actual commencement of benefits to such Participant, his beneficiary shall have the option to receive benefits either (a) in accordance with the provisions applicable

---

[3]    Prior to sending his letter of July 6, 2001, the Plan had performed the calculations of Mr. Winders' years of service and his 'Matched Pension Hours' and determined that Mr. Winders qualified for Unreduced Early Retirement.  (JR-0101-0109).  Then, on July 6, 2001, the Plan communicated to Mr. Winders about his "monthly pension check."  (JR-0112).

5

> to the form of benefit elected by the Participant prior to his death; or (b) under the remaining provisions of this Article 7 as if the Participant had died prior to retirement. If the Participant dies without satisfying all of the requirement for the payment of benefits under the Plan, payment shall be made in accordance with the remaining provisions of this Article 7 as if the Participant had died prior to retirement, unless the Trustees determine, in a non-discriminatory manner, to allow the Participant's beneficiary to receive benefits in some other form.

(JR-0035).

Thus, Section 7.03 envisions two different situations. First, if the Participant has "satisfied all requirements for a benefit to commence under the Plan, including the completion of an application with the Fund Administrator in which a payment form is elected," then his beneficiary "shall" have the option of receiving either a monthly payment or a lump sum payment. In other words, where the Participant has satisfied all eligibility requirements and has completed an application "in which a payment form is elected" the administrator has no discretion, as the beneficiary's decision regarding the type of benefit to be received (i.e., monthly v. lump sum) "shall" be honored. Second, where the Participant has not satisfied all requirements for a benefit to commence, including an application electing a payment form, then payment shall be made "in accordance with the remaining provisions of … Article 7 as if the Participant had died prior to retirement.…" In this case, therefore, the critical question is whether Ronald D. Winders "satisfied all requirements for a benefit to commence … including the completion of an application in which a payment form is elected.…" If so, the Plan obligates the Administrator to honor Ronald L. Winders' decision to receive a monthly payment for 60 months.

Under the language of the Plan, the decedent "satisfied all requirements for a benefit to commence." Defendant does not dispute that Mr. Winders was a "Participant" in the Plan (Section 1.21, JR-0012); that he satisfied eligibility requirements to participate in the Plan

(Section 2.01, JR-0017); that he was entitled to Unreduced Early Retirement (Section 4.02(a), JR-0020-0021); and that he was over the age of 61.  (Section 5.02(b), JR-0025-0026).  (See also, SPD, page 6, JR-0062 and SPD, page 16, JR-0072).  Thus, the next question is whether Ronald D. Winders "completed an application in which a payment form is elected.…"  Again, there is no dispute that Mr. Winders "completed an application."  (JR-0094-0097).  In that application, he elected to receive "Unreduced Early Retirement" benefits (JR-0095) and, by so doing, he elected a "payment form."  As noted previously, the definition of "Unreduced Early Retirement" in and of itself means that a "monthly … benefit" has been elected.  (Section 5.02(b), JR-0025).  Under Section 5.02(b), this "monthly Unreduced Early Retirement benefit" is paid "in the Normal Form," which means for 60 months certain.  (Section 1.19, JR-0012).  That Mr. Winders opted for a guaranteed payment for 60 months is compelled by the language of the Plan, and the SPD (JR-0062 and JR-0072),[4] a conclusion in which the Plan concurred before Mr. Winders' death.  (see, JR-0112, in which the Plan references his "monthly pension check").  Because Mr. Winders had elected a monthly pension benefit, payable in the "Normal Form," the Plan was obligated to honor his son's election to receive 60 monthly payments.

Mr. Orrand also cited Section 7.05 in refusing to honor the request for 60 monthly pension payments.  But, Section 7.05 only applies where the Participant "dies before actual retirement."  (JR-0038).  Neither "retirement" nor "actual retirement" are defined in the Plan. (See, Plan Definitions, JR-0006-0017).  The Application asks the Participation to identify the "last day worked as an operating engineer."  (JR-0095).  Here, Ronald D. Winders last worked on June 28, 2001.  (Id.).

---

[4]       See, SPD at JR-0072, which provides that if a Participant dies before receiving his 60 monthly payments, his beneficiary or his estate "will receive the remaining unpaid installments…." which, in this case, is 60 installments.

Defendant has produced a document entitled "Matched Pension Hours" which reflects that the decedent worked as a Operating Engineer from June, 1968 through June, 2001. (JR-0101-0109). Defendant asserts that Mr. Winders worked 40 hours in July, 2001. Defendant implies that working after he filed his application for Unreduced Early Retirement Benefits somehow disqualifies Mr. Winders from receipt of retirement benefits. Such an argument is, however, contradicted by the language of the Plan. As noted, the terms "actual retirement" or "retirement" are not defined in the Plan. But, Article 4, which governs "Eligibility for Retirement Benefits" states that payment of retirement benefits commences "on the first day of any month following the month in which a Participant's application for his normal retirement benefit is received and approved by the Fund Administrator." (Section 4.01, JR-0020). Similar language is used with respect to Unreduced Early Retirement. (See, Section 4.02, JR-0020 to JR-0022). Thus, by virtue of Section 4.01, the event from which eligibility is measured is completion of the Application, not cessation of all work. Nothing in the language of the Plan prohibits a Participant from working between the date of the application and the commencement of receipt of retirement benefits. Indeed, one would assume that this is commonplace. Otherwise, the Participant would be deprived of income between the date of the Application and receipt of the first monthly retirement check. Nothing in the Plan requires the impoverishment of the retiree upon submission of the Application. Therefore, the undisputed evidence establishes that Mr. Winders had actually retired, thereby rendering Section 7.05 inapplicable.

Ronald L. Winders contested the Administrator's refusal to pay a monthly benefit in the Normal Form in a letter dated September 18, 2001, in which he stated:

> My father officially retired from Kokosing Construction Company on June 29, 2001. All paperwork was completed and filed at this time. Unfortunately, my

father passed away on July 11, 2001.…  I believe that I am entitled to the 60
month guarantee payment plan.… I believe a review of this case is in order.…

(JR-0147).

The Trustees of the Plan, in a Board Meeting of October 17, 2001, affirmed Mr. Orrand's

decision to allow only a lump sum payment.  (JR-0166).  Ronald D. Winders has now filed this

action, seeking the 60 monthly payments to which he is entitled under the Plan.

## III.    ARGUMENT

**A.    The Magistrate Judge erred in applying arbitrary and capricious review.
The Plan Trustees have no discretion as to whether to honor Ronald D.
Winders' decision to receive monthly Unreduced Early Retirement benefits,
pursuant to the language of the Plan.**

The Magistrate Judge erroneously applied arbitrary and capricious review to the

Administrator's Decision.  The Magistrate Judge was in error, as the applicable provision of the

Plan does not require any "construction" or "interpretation."  Since it lacks the ambiguity

necessary to give risk to construction or interpretation, no construction or interpretation is

required and, hence, *de novo* review should be applied.

As this Court is aware, it is required to review the actions of an ERISA plan

administrator *de novo*, unless the benefit plan expressly gives the Plan Administrator or the

fiduciary discretionary authority to determine eligibility for benefits or to construe the Plan's

terms, in which case a more deferential standard of review is appropriate.  Firestone Tire and

Rubber Company v. Bruch, 489 U.S. 101 (1989).  Followed, Perez v. Aetna Life Insurance

Company, 150 F.3d 550 (6th Cir. 1998); Yeager v. Reliance Standard Life Insurance Company,

88 F.3d 376 (6th Cir. 1996).  In Anderson v. Great West Life Assurance Co., 42 F.3d 392 (6th

Cir. 1991), the Court recognized that a grant of discretionary authority under ERISA may be

partial.  On those issues where discretion is given, the fiduciary's determination is reviewed

9

under the abuse of discretion standard.  Where, however, a grant of discretionary authority is not expressly delegated on some issues, the Court must apply *de novo* review.  Id., at 392.

In this case, the Magistrate Judge cited Section 9.02 of the Plan to justify deferential review of Defendant's benefits decision.  Section 9.02, however, gives the Trustees or the Fund Administrator discretion "to construe and interpret the Plan, decide all questions of eligibility and determine the amounts, manner, and time of payment of any benefits hereunder.…"  Here, Section 9.02 cannot be deemed a delegation of discretion, as the Plan language is not in need of "construction" or "interpretation."

If "construction" or "interpretation" of the Plan were required, the Trustees might possess discretion.  But, Section 7.03 precludes the exercise of such discretion.  As noted previously, under Section 7.03, where the participant has "satisfied all requirements for a benefit to commence" and has completed "an application … in which a payment form is elected …" the beneficiary "shall" have the option to receive the benefits in the manner elected by the Participant prior to death or under the remaining provisions of Article 7.  Under Section 7.03, where there is an entitlement to benefits, the Plan is obligated to honor that entitlement in the form selected by the Participant or his beneficiary.  The Plan states that the administrator "shall" follow the form selected by the Participant, unless the beneficiary elects otherwise.  The common meaning of "shall" means that the administrator is presented with a mandatory, not a discretionary, obligation.  See, e.g., State ex rel. Botkins v. Laws, 69 Ohio St.3d 383, 632 N.E.2d 897 (1994); Stephan v. State Veterinarian Medical Board, 113 Ohio App. 538, 173 N.E.2d 389 (1960).[5]  This language is unambiguous, rendering construction or interpretation unnecessary.

---

[5]    The word "shall" is defined as "will have to"; is "used to express command or exhortation."  See, Webster's Third New International Dictionary (Unabridged), 1996.

Under ERISA, the Courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans." <u>Pilot Life Insurance Company v. Dedeux</u>, 481 U.S. 41, 56 (1987). <u>See</u> <u>also</u>, <u>Franchise Tax Board v. Construction Labors Vacation Trust</u>, 463 U.S. 1, 24, Note 26 (1983) ("[A] body of federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." <u>quoting</u>, 129 Cong. Rec. 29942 (1974), remarks of Senator Javits).[6]   In developing the federal common law, the federal court may take direction from the law of the state in which it sits or it may generally review law on an issue and adopt a federal rule. <u>PM Group Life Insurance Company v. Western Growers Assurance Trust</u>, 953 F.2d 543, 546 (9th Cir. 1992). <u>Accord</u>, <u>Regents of the University of Michigan v. Employees of Agency of Rent-A-Car Hospital Association</u>, 122 F.3d 336, 339 (6th Cir. 1997). <u>See</u> <u>also</u>, <u>Dingledine v. Central Reserve Life Insurance Company</u>, 934 F.Supp. 892, 898 (S.D. Ohio 1996).

Following this directive, the Courts have regularly recognized that the ordinary principles of contract interpretation govern the interpretation of pension plans covered by ERISA. <u>See</u>, <u>e.g.</u>, <u>Matthews v. Sears Pension Plan</u>, 144 F.3d 461, 465 (7th Cir. 1998), <u>reh. denied</u>, 1998 U.S. App. LEXIS 15440 (7th Cir. 1998); <u>Burnham v. Guardian Life Insurance Company</u>, 873 F.2d 486, 489 (1st Cir. 1989).   As the Courts have noted, the relevant principles of contract interpretation are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA. <u>See</u>, <u>e.g.</u>, <u>Santaella v. Metropolitan Life Insurance Company</u>, 123 F.3d 456, 461 (7th Cir. 1997); <u>Swaback v. American Information Technologies Corp.</u>, 103 F.3d 535, 540 (7th Cir. 1996); <u>Wegner v. Standard Insurance Company</u>,

---

[6]      To the same effect, <u>see</u>, <u>In Re White Farm Equipment Company</u>, 788 F.2d 1186, 1191 (6th Cir. 1986), which held that the District Court must develop its own rules of decision in cases "where ERISA itself furnishes no answer."   <u>Accord</u>, <u>Murphy v. Hemppenstall Company</u>, 635 F.2d 233, 237 (3d Cir. 1980), <u>cert. denied</u>, 454 U.S. 1142 (1982).

129 F.3d 814, 818 (5th Cir. 1997); and <u>Denzler v. Questech, Inc.</u>, 80 F.3d 97, 101 (4th Cir. 1996).

The federal courts, in following the directive to establish a body of federal common law under ERISA, have generally followed contract rules initially adopted under state law.[7] Among the rules of contract interpretation adopted as part of the federal body of common law under ERISA is the "four corners rule." In other words, where the language of an ERISA pension plan is unambiguous, no construction is necessary. <u>See, e.g.</u>, <u>Matthews v. Sears Pension Plan</u>, 144 F.3d 461, 466 (7th Cir. 1998); <u>Curry v. Colonial Life Insurance Company of America</u>, 737 F.Supp. 847 (E.D. Pa., 1990). The Court followed this rule in <u>Swaback v. American Information Technologies Corporation</u>, 103 F.3d 535, 540-541 (7th Cir. 1996), in which the Court held:

> … [B]ecause the case was brought pursuant to ERISA, federal common law principles of contract interpretation govern.… These principles require us to interpret terms of ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.… Extrinsic evidence should not be used where the contract is unambiguous.…

(Citations omitted). <u>Accord</u>, <u>Helwig v. Kelsey-Hayes Company</u>, 93 F.3d 243, 251 (6th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 690 (1997); <u>Epright v. Environmental Resources Management, Inc. Health and Welfare Plan</u>, 81 F.3d 335, 340 (3d Cir. 1996).

**B.    The Magistrate Judge erred in his interpretation of the Plan.  Since the Plan is unambiguous, Ronald D. Winders was entitled to receive monthly <u>Unreduced Early Retirement benefits.</u>**

Here, Section 7.03 is unambiguous. Under Section 7.03, where, as here, the participant has "satisfied all requirement for a benefit to commence under the Plan" and has completed "an application … in which a payment form is elected" then his beneficiary "shall" have the option

---

[7]       For example, the mailbox rule has been applied in ERISA cases [<u>Schikore v. Bank America Supplemental Retirement Plan</u>, 269 F.3d 956, 961 (9th Cir. 2001)], and the doctrine of "reasonable expectations" has been followed in ERISA cases [<u>Peterson v. American Life and Health Insurance Company</u>, 48 F.3d 404, 411 (9th Cir. 1995), <u>cert. denied</u>, 516 U.S. 942 (1995); <u>Boston Mutual Insurance Company v. Murphree</u>, 21 F.Supp.2d 1076, 1080 (D. Ariz. 1998)].

of receiving either a monthly payment or a lump sum payment. Therefore, in applying Section 7.03, the Court need only concern itself with two issues. First, did Ronald D. Winders satisfy all requirements for a benefit to commence under the Plan? Second, did Ronald D. Winders complete an application "in which a payment form is elected"? If both of these questions are answered in the affirmative, no interpretation of the Plan is required, as the Plan then mandates the Administrator to honor Mr. Winders' selected payment option.

Looking to the first question, Mr. Winders plainly satisfied all requirements for a benefit to commence under the Plan. Pursuant to Section 5.02(b), any Participant is permitted to retire on or after the date on which he attains age 61, provided that the Participant has Employer contributions for at least 300 Hours of Service in each of 30 Service Credit Years. (JR-0025). Here, no one disputes whether Mr. Winders had attained the age of 61. His date of birth was April 22, 1940. (JR-0095). Therefore, when he submitted his application for retirement on June 29, 2001, he had passed his 61st birthday. Nor has anyone disputed that Mr. Winders had the requisite 300 Hours of Service in each of 30 Service Credit Years. Defendant's documents reflect that Mr. Winders commenced work in June of 1968 and discontinued work in June of 2001. This amounts to 33 years of work. (JR-0101-0109). Likewise, he had more than 300 Hours of Service in each of those years, except 1981, in which he worked 217 hours. (JR-0106). Nonetheless, even excluding 1981, the fact remains that he had more than 30 years of service with more than 300 Hours of Service. Accordingly, Mr. Winders had satisfied all requirements for a benefit to commence under the Plan. Accordingly, the first relevant question must be answered in the affirmative.

The second question, as noted previously, is whether Mr. Winders completed an application "in which a payment form is elected.…" Here, Mr. Winders selected "Unreduced

Early Retirement."  Under Section 5.02(b), "Unreduced Early Retirement" benefits shall be paid "monthly."  Clearly, therefore, Mr. Winders selected monthly benefits.  Moreover, by electing "Unreduced Early Retirement" benefits, he selected payment in the "Normal Form."  Section 1.19 of the Plan specifically defines "Normal Form" to mean an immediate 5 years certain, payable in 60 monthly installments.

Defendant has asserted that Mr. Winders had not completed an "Election of Payment" form, as he had not selected between a Life Annuity with 60 payments certain or a 50 percent Contingent Annuity.  (JR-0089).  But, this argument presents a false choice.  Under Section 5.02(b), whenever Unreduced Early Retirement is selected, it is a monthly benefit paid in the "Normal Form," i.e., in 60 monthly installments.  Section 6.01 of the Plan provides that, at the time a Participant becomes entitled to receive a benefit, the Fund Administrator shall make payment from the Plan to the Participant in either the "automatic form of payment" or "in one of the optional methods of payment.…"  (JR-0029).  Section 6.01(b) provides as follows:

> Unless an optional form of payment is elected by the Participant … within the 90 day period ending on the Annuity Starting Date, the benefit of an unmarried Participant shall be paid in the Normal Form.

Because Mr. Winders died before the 90 day period expired, he could not and did not elect "an optional form of payment."  Accordingly, his benefit was payable "in the Normal Form" pursuant to Section 6.01(b).  Thus, by default, the "Normal Form" became applicable.  Under Section 6.01(c), therefore, Mr. Winders' heir would receive Mr. Winders' pension payments "payable in monthly installments...."

Defendant states that Mr. Winders did not satisfy all requirements for benefits because there was an optional form of payment called a "Contingent Annuitant" option.  (Reply, p. 9).

Defendant cites to JR-0087 to assert that both the Life Annuity (60 payments certain) and

the Contingent Annuitant Benefit result in monthly payments.  But, this argument ignores the definition of "Normal Form."  Section 1.19 of the Plan defines "Normal Form" as payment for "an immediate five years certain and life annuity payable in monthly installments … for 60 months certain…."  (JR-0012).  JR-0087, a form letter used by the Plan, defines the Life Annuity as a guaranteed 60 monthly payments.  Thus, the Life Annuity is payment in the "Normal Form."  Under Section 5.02, Unreduced Early Retirement benefits are paid in the "Normal Form," i.e., the Life Annuity - 60 payments certain, unless another form (the Contingent Annuitant) is selected.  (JR-0087).  Since Mr. Winders died before electing another form, the benefits are payable in the "Normal Form" and his son is now entitled to 60 monthly payments.

Defendant ignores Mr. Winders' election to receive payments in the "Normal Form."  The Contingent Annuitant option is just that, an option.  It is not a requirement to receive benefits under the Plan.  There was no need to select an optional form of payment since Mr. Winders' retirement benefit was payable in Normal Form.  To imply that an "optional" form of payment is a "requirement" is inconsistent with the Plan language.  To the extent that the Plan's language is susceptible to more than one interpretation, the rule of *contra proferentum* requires that the ambiguities be construed against Defendant.  Perez v. Aetna Life Insurance Co., 150 F.3d 550, 557 n.7 (6th Cir. 1998).  Mr. Winders did not elect the Contingent Annuitant option and it is irrelevant to his application for benefits.

Defendant, nonetheless, asserts that Plaintiff is not entitled to benefits payable in the "Normal Form," because there is no proof that the decedent would have:  (1) elected a life annuity; (2) changed his beneficiary designation card; and (3) designated Plaintiff as his beneficiary.  Defendant's argument misconstrues the language of the Plan.  First, there was no need to elect a "life annuity."  As noted above, because the decedent did not elect one of the

15

"optional forms" of payment, his benefit was payable in the "Normal Form." Thus, by merely seeking Unreduced Early Retirement benefits payable in the Normal Form, the decedent elected the life annuity. This is so because the life annuity applies by virtue of the "Normal Form" definition. The Normal Form prevails unless an alternative is selected. Here, no alternative was selected. Hence, the Normal Form is applicable and 60 payments certain are required. Nor would the decedent have been required to change his beneficiary designation card. The SPD states that if a Participant dies before receiving his 60 monthly payments from the Plan, his beneficiary or his estate will receive all remaining unpaid installments. (SPD, p. 16, JR-0072). Here, the designated beneficiary was Mr. Winders' ex-wife. Thus, she would have been entitled to the benefits under the Plan. But, however, she has disclaimed all benefits under the Plan. (See Attachment A). As Plaintiff was his father's sole heir, Plaintiff then became entitled to the benefit, by virtue of the SPD. For this reason as well, there is no need for Plaintiff to prove that Mr. Winders would have designated his son as his beneficiary under the Plan.

Defendant contended that the SPD, which states that it takes approximately 60 days to process applications for Unreduced Early Retirement benefits, somehow imposes some additional requirement on Mr. Winders. Neither the alleged additional steps, nor the purported 60 day waiting period, are contained in the Plan. Instead, Defendant seeks to graft additional unwritten requirements onto the express language of the Plan. The isolated time estimation for the processing of benefit applications cannot effect Mr. Winders' vested rights and impose additional requirements not reflected in the Plan. Defendant's 60 day administrate delay in processing cannot be read as creating additional obligations on the part of the retiree. The Plan simply makes no provision for a 60 day waiting period and it is irrelevant.

Defendant contended, and the Magistrate Judge agreed, that Mr. Winders was not "retired" since he continued to work after submitting his application for retirement benefits. This argument is not supported by the language of the plan.

Although neither the Plan or the SPD contains a definition for "retirement," Defendant contends that Mr. Winders had not retired as he was required to "complete several forms" which "typically take 60 days to complete." Defendant states that Section 7.05 requires a determination that Mr. Winders had not retired under the terms of the Plan, as he had not completed several forms which typically take 60 days to complete. As authority, Defendant cites to Section 7.05 at AR0038. However, such reliance is misplaced. Section 7.05 merely contains a default provision in the event a Participant "dies before actual retirement...." There is no definition of "retirement" or "actual retirement." The application completed by Mr. Winders indicates that the "last day worked as an operating engineer" was June 28, 2001. Defendant has no authority for its implication that, because Mr. Winders worked 40 hours in July, 2001, he is somehow disqualified from the receipt of retirement benefits. Article 4, which governs eligibility for retirement benefits, states that the payment of retirement benefits commences "on the first day of any month following the month in which a Participant's *application* for his normal retirement benefit is received and approved by the Fund Administrator." (Section 4.01, AR0020). Accordingly, the triggering event from which retirement is measured is the application, not the cessation of all work. There is no requirement in the Plan that a Participant to cease work on the date an application is submitted for retirement benefits. To the contrary, one would expect a retiree to continue working until such time as he begins receiving monthly benefits in order to avoid a disruption in income.

Second, Mr. Winders completed an application in which he designated his "last day worked" as June 28, 2001. A payment form was elected by selecting Unreduced Early Retirement which requires that benefits be paid "monthly." This express language indicates Mr. Winders' election of monthly benefits. Moreover, Mr. Winders' selection of Unreduced Early Retirement benefits indicated that he selected payment in the "Normal Form." The Plan defines "Normal Form" to mean an immediate five years certain, payable in 60 monthly installments. (AR0007).

Therefore, under the language of the Plan, Mr. Winders was entitled to payments in the Normal Form, which is 60 monthly payments.

## C. Under the Summary Plan Description, Plaintiff is Entitled to Receive 60 Monthly Payments.

The conclusion that Mr. Winders elected 60 payments (i.e., "Unreduced Early Retirement" payable in the "Normal Form") is mandated by the Summary Plan Description. Page 16 of the Summary Plan Description ("SPD") specifically states as follows:

> The normal form of payment for normal, early or disability retirement is a monthly pension for your lifetime with a minimum of 60 payments guaranteed. **Under this form, if you should die before you receive 60 monthly payments from the Plan, your beneficiary or your estate will receive the remaining unpaid installments.**

(JR-0072) (emphasis added). Thus, the SPD plainly provides that if the Participant dies before he receives his 60 monthly payments, his beneficiary or his estate "will receive the remaining unpaid installments," even if all 60 remain unpaid. The SPD further states that the Contingent Annuitant option is "another optional form of payment which you may elect…." (SPD, p. 17, JR-0073). Plainly, therefore, the Contingent Annuitant option only applies if specifically elected by the Participant. Since Mr. Winders did not specifically elect the Contingent Annuitant option, the Normal Form prevails.

The SPD, which is required by 29 U.S.C. §1022, must be "written in a manner calculated to be understood by the average plan participant and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the Plan...." 29 U.S.C. §1022(a). The SPD is the statutory "plain language" mechanism for informing Plan Participants of the terms of the Plan and its benefits. Hicks v. Flemming Companies, 961 F.2d 537, 539-540 (5th Cir. 1992).

The Sixth Circuit has clearly emphasized the importance of the SPD in determining the meaning of the Plan. In Edwards v. State Farm Mutual Automobile Insurance Company, 851 F.2d 134 (6th Cir. 1988), the Court held that statements made in SPDs are binding and, if they conflict with statements made in the Plan itself, the SPD controls. Id., at 136. The defendant in Edwards attempted to deny an employee disability benefits. Id., at 135. Under its Employee Benefit Plan, eligibility for disability benefits was calculated by adding the employee's age to the employee's "credited service" (i.e., the amount of time the employee had worked for the company up to the date of his or her disablement). Id. Only those employees whose age plus amount of credited service totaled 55 years or more were eligible for disability benefits. Id. The SPD given to the employees by the defendant stated that "time while on sick leave counts for plan membership and ... as credited service...." Id. Under the SPD, therefore, Edwards had enough credited service to be eligible for disability benefits. Id. Under the definitions in the plan document, however, Edwards' time on sick leave was excluded from credited service, and, therefore, he did not have enough credited service to be eligible for disability benefits. Id. The Court in Edwards held that State Farm could not, in reliance on the plan document, deny Edwards disability benefits because "statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." Id., at 136.

Discussing <u>Edwards</u> in the later case of <u>Helwig v. Kelsey-Hayes Company</u>, 93 F.3d 243

(6th Cir. 1996), the Court noted:

> Our decision in <u>Edwards</u> recognized the impact that summary descriptions have
> on lay beneficiaries....  We noted that employees count on them to provide an
> accurate picture of their current benefit situation, as well as for information
> which will allow them to make intelligent decisions about their future benefit
> needs....  As we explained in <u>Edwards</u>, State Farm should have realized that the
> explicit language and the promises made in their SPD would cause
> unsophisticated lay employees to rely on the representations.... We held,
> however, that "... precedent does not dictate that the claimant who has been
> misled by summary descriptions must proof detrimental reliance.... Instead, we
> concluded that it is the employer's duty to put the employees on notice of their
> rights under the Plan, and if they fail to adequately do so, they will be precluded
> from enforcing plan language which conflicts with summary description
> language to the detriment of their employees...."

93 F.3d at 247.

In <u>Helwig</u>, the Court noted that "this Court has held quite clearly that promises made in

SPDs are binding on the employer regardless of conflicting language in a master agreement."

<u>Id.</u>, at 249.  The Court in <u>Helwig</u> noted:

> … We conclude that it would make no sense for Congress to require employers
> to provide clear, simple, complete descriptions of benefit plans if the employee
> were expected to also know and understand every clause in the voluminous,
> complex, and legalistic document the SPD was intended to accurately
> describe….

Id., at 249-250.

Here, the language of the SPD could not be clearer.  The SPD plainly states that

Unreduced Early Retirement benefits will be a monthly pension benefit payable for the

employee's lifetime, "with a minimum of 60 payments guaranteed."  The SPD states that "if you

should die before you receive 60 monthly payments from the Plan, your beneficiary or your

estate will receive the remaining unpaid installments."  As in <u>Edwards</u> and <u>Helwig</u>, the SPD here

was produced under a statutory obligation of comprehensiveness and accuracy.  As noted in

Helwig, "employers may not construct SPDs in such a manner that they mislead employees into thinking they have a right to benefits when other documents obliquely negate those rights." Id., at 250. Under the plain language of the SPD, Mr. Winders had the right to believe that he was going to receive 60 monthly payments and that if he died before receiving all 60 payments, his beneficiary or his estate would receive all remaining unpaid installments.

This language could not be clearer. Ronald D. Winders elected Unreduced Early Retirement. Under the SPD, that means he elected "a monthly payment for [his] lifetime with a minimum of 60 payments guaranteed." Since Ronald Winders died "before [he] receive[d] 60 monthly payments from the Plan," his beneficiary is entitled to "receive the remaining unpaid installments." No distinction is drawn in the SPD between a situation where the employee has begun receiving a monthly pension payment or a situation where monthly pension payments have not yet commenced. The language is clear - the beneficiary is entitled to receive the balance of the unpaid installments in monthly installments.

Under Sixth Circuit law, if the SPD is deemed to be in conflict with the language of the Plan, the SPD controls. In any event, the Sixth Circuit has made clear that the language of the SPD is binding. Since the SPD plainly provides that the beneficiary will receive the balance of the unpaid installments in monthly installments, Ronald L. Winders is entitled to receive the 60 unpaid monthly installments to which his father was entitled as a Participant in the Plan.

Accordingly, under the language of the Plan and, most clearly, under the language of the SPD, Ronald D. Winders elected to receive his benefits in the "Normal Form." Thus, Ronald D. Winders elected to receive 60 monthly installments. Under the SPD, his heir, Ronald L. Winders, is entitled to receive "the remaining unpaid installments." Since all 60 installments remain unpaid, the SPD language, which controls over the language of the Plan, requires the

administrator to pay to Ronald L. Winders all 60 payments to which Ronald D. Winders was entitled.

    **D.**    **Assuming that the Plan grants to the administrator the discretion to decide the method of payment, the administrator abused his discretion in insisting <u>upon lump sum payments.</u>**

ERISA provides that a fiduciary is to discharge his duties with respect to the Plan "in accordance with the documents and instruments governing the Plan."  29 U.S.C. §1104(a)(1)(D). Even where a plan provides for discretion, the Court is not to "rubber stamp" the decision of the administrator.  <u>See</u>, <u>e.g.</u>, <u>Donato v. Metropolitan Life Insurance Company</u>, 19 F.3d 375, 380 (7th Cir. 1994).  If fiduciaries or administrators of an ERISA Plan controvert the plain meaning of the Plan, their actions are deemed arbitrary and capricious.  <u>Swayback v. American Information Technologies Corp.</u>, 103 F.3d 535, 540 (7th Cir. 1996).  As previously set forth, the action of the administrator, in insisting upon a lump sum payment, when the Plan requires monthly payments, and when the SPD requires monthly payments, is an arbitrary and capricious action.

Moreover, notwithstanding the deferential standard of review, courts must be aware of any possible conflicts of interest and consider them as a factor in determining whether the decision to deny benefits was arbitrary and capricious.  <u>Davis v. Kentucky Finance Companies Retirement Plan</u>, 887 F.2d 689, 694 (6th Cir. 1989); <u>Borda v. Hardy, Lewis, Pollard, and Page, P.C.</u>, 138 F.3d 1062, 1069 (6th Cir. 1998) (noting that "the abuse of discretion or arbitrary and capricious standards still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest.").  <u>Followed</u>, <u>Darland v. Fortis Benefits Insurance Company</u>, 317 F.3d 316, 2003 U.S. App. LEXIS 937, *30-31 (6th Cir. January 22, 2003).  In <u>Darland</u>, the Court noted that there was an actual, readily apparent conflict, not a mere potential for one, when the Plan Administrator is the party that ultimately pays the benefits.  <u>Id.</u>,

*32, citing, Killian v. Healthsource Provident Administrators, Inc., 152 F.3d 514, 521 (6th Cir. 1998).

Here, the Plan decided that Mr. Winders' son would receive a lump sum payment, rather than 60 monthly payments. Plainly, the payment required of the Plan by virtue of this decision is significantly less than what would be required had the Plan been required to pay all 60 installments. Accordingly, the Plan has not only an apparent, but an actual, conflict of interest in deciding to award a lesser benefit to Mr. Winders' heir. The Plan plainly saved money by its decision. As a result, this conflict of interest must be considered in applying abuse of discretion review, assuming that the abuse of discretion review even applies.

Without reiterating the prior arguments, it is apparent that Mr. Winders elected "Unreduced Early Retirement." Such benefits are, by virtue of the language of the Plan, payable in the "Normal Form," which means 60 monthly installments. This interpretation is upheld by the plain language of the Plan, as well as by the plain language of the SPD. Accordingly, even if the arbitrary and capricious standard applies, this Court must conclude that the Plan acted in an arbitrary and capricious manner when it attempted to save money by relegating Mr. Winders' son to the lesser Plan benefit.

## IV.  CONCLUSION

Based upon the foregoing authority and arguments, it is respectfully submitted that the Magistrate Judge erred in granting judgment on the record in favor of the Defendant. The Plan and the Summary Plan Description do not require a heightened standard of review. The Magistrate Judge erred in applying arbitrary and capricious review to the Administrator's Decision. From this erroneous application of the deferential standard of review, the Magistrate Judge erred in his review of the Plan. The Plan and the Summary Plan description both require

unreduced early retirement benefits payable in the "normal form," which means that Ronald D. Winders elected to receive 60 monthly installment payments, not a lump sum payment.  The Summary Plan Description provides that, since Ronald D. Winders died before receiving all 60 monthly payments, his heir, Ronald L. Winders, was entitled to receive all remaining unpaid installments.  Since all 60 installments remain unpaid, Ronald L. Winders is entitled to receive all 60 monthly payments.

Respectfully submitted,

/s Randy J. Blankenship
Daniel J. Temming (#0030364)
Randy J. Blankenship (#0034594)
Attorneys for Plaintiff
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, OH 45202-2417
TEL:          (513) 721-3330
FAX:          (513) 721-5001
E-MAIL:       rblankenship@rkpt.com

/s Anthony J. Gertz
Anthony J. Gertz (#0008226)
Attorney for Plaintiff
Gertz & Gertz, L.P.A.
401 Pike Street
Reading, Ohio  45215
TEL:          (513) 554-1868
FAX:          (513) 554-1897
E-MAIL:       agertz@gertzlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been furnished to Thomas M. Tarpy. Scott A. Carroll, and David A. Campbell, Vorys, Sater, Seymour and Pease LLP, P.O. Box 1008, 52 East Gay Street, Columbus, Ohio 43215-1006, by regular U.S. mail, postage prepaid, this 10th day of October, 2003.

/s Randy J. Blankenship
Randy J. Blankenship

P:\RKPT\Data\wp\RANDY\L2728 0001 (Motion for Review).doc

24