UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RONALD L. WINDERS | : | Case No. C-1-02-459 |
| | : | |
| Plaintiff, | : | Judge Weber |
| | : | Magistrate Judge Hogan |
| v. | : | |
| | : | **PLAINTIFF'S REPLY BRIEF TO** |
| OHIO OPERATING ENGINEERS | : | **DEFENDANT'S MEMORANDUM IN** |
| FRINGE BENEFIT PROGRAMS | : | **OPPOSITION TO PLAINTIFF'S** |
| | : | **MOTION FOR REVIEW OF** |
| Defendant. | : | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION AND** |
| | : | **OBJECTIONS TO SAID REPORT** |
| | : | **AND RECOMMENDATION** |

**I.      INTRODUCTION AND COUNTERSTATEMENT OF FACTS**

The issue before the Court is whether Defendant's decision to deny Mr. Winders' request for monthly Unreduced Early Retirement ("UER") benefits was consistent with, and justified by, the language of the plan instrument. Both the plan instrument and the Summary Plan Description ("SPD") require that UER benefits be paid to Mr. Winders in 60 monthly installments. This conclusion is mandated by the plain language of the plan and SPD and, hence, requires no construction or interpretation. Accordingly, deferential review of the Plan Administrator's decision is not warranted.

The Magistrate Judge's determination that Mr. Winders is entitled only to a lump sum payment arises, at least in part, from the erroneous conclusion that the arbitrary and capricious standard of review applies to the Plan Administrator's decision. Had the *de novo* standard of review been applied, the Magistrate Judge would have concluded that Mr. Winders was indeed entitled to a "monthly" retirement benefit.

Mr. Winders last day of work was June 28, 2001 for Kokosing Construction Company. (JR-0095). The Board of Trustees' decision affirming the Plan Administrator was based upon the fact that Mr. Winders "was still actively working after his pension application was received," but neglected to consider the fact that Mr. Winders had indeed ceased working before the date of his death. (JR-0166). The Report and Recommendation found that Mr. Winders continued to work full-time after he submitted his application for retirement benefits. (<u>See</u>, Report and Recommendation at p. 7). This conclusion was based on Defendant's assertion that Mr. Winders worked forty (40) hours in July, 2001, as allegedly evidenced by Document No. JR-0100. (Affidavit of Ronald L. Winders at ¶ 8, hereinafter "Winders, ¶ \_\_\_\_"). But, this document does not justify this conclusion.

This document is captioned "Matched Pension Hours" and is dated January 2, 2003. (Winders, ¶ 8; JR-0100). This does not mean, however, that Mr. Winders actually worked in July, 2001. (Winders, ¶ 8). Rather, the document reflects that Mr. Winders received his last paycheck in July, 2001 for hours worked in June, 2001. (Winders, ¶ 8). Indeed, this is consistent with the business practice of Kokosing Construction, which pays its employees one week behind the time period for the time actually worked. (Winders, ¶ 8). Accordingly, the 40 hours appearing for July, 2001 would actually reference work performed in the last week of June, 2001, with Mr. Winders performing no work in July, 2001.[1] (Winders, ¶ 8).

Moreover, the "Matched Pension Hours" document is dated January 2, 2003 while the Board of Trustees Meeting affirming the decision of the Plan Administrator occurred on October 17, 2001 (JR-0166). Thus, the very document upon which Defendant relies for its assertion that

---

[1] Indeed, this is consistent with the calendar for July, 2001. Had Mr. Winders been working full-time in July, 2001, as Defendant contends, he would have had two workdays, July 9th and 10th, for which he would have been paid before his death on July 11, 2001.

2

Mr. Winders was not actually "retired," was not even before the Plan Administrator or Board of Trustees in making its decision. The document is offered solely as an after-the-fact justification of the Plan Administrator's decision.

In completing his application for benefits, Mr. Winders indicated that he was applying for UER benefits. (JR-0095). By electing UER benefits, Mr. Winders sought benefits under Section 5.02(b) of the Plan which provides:

> A Participant who retires on or after the date on which he attains age 61, with Employer contributions for at least 30 Hours of Service and each of 30 Service Credit Years will be entitled to a **monthly** Unreduced Early Retirement Benefit, determined in the normal form. The amount of a Participants Unreduced Early Retirement Benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his **monthly** past service benefit (if any) and his **monthly** future service benefit as of the date of his Unreduced Early Retirement.

(JR-0025-0026) (emphasis added).

By electing UER benefits under Section 5.02(b), Mr. Winders clearly elected to receive a "monthly" benefit. Further, Section 5.02(a), which governs UER benefits when elected after age 62, also indicates that it is a "monthly payment." (JR-0025).

The conclusion that Mr. Winders had specified monthly payments, as opposed to a lump sum payment, is further buttressed by the definition of "Normal Form" in Section 1.19 of the Plan. To this end, Section 5.02(b) requires not only that UER benefits shall be "monthly," but also that the monthly benefits shall be paid in the "Normal Form." Section 1.19 defines "Normal Form," as follows:

> "Normal Form" means an immediate five year certain and life annuity, **payable in monthly installments** on the first day of each calendar month **for 60 months certain** and thereafter on the first day of each calendar month in which the Participant has lived the entire proceeding month. **In the event of the Participant's death during the 60-month certain period, monthly payments,** in the same amount as those made during the Participant's life **shall continue to the Participant's beneficiary for the balance of such period certain.**

3

(JR-0012) (emphasis added).

By electing "monthly" UER benefits, Mr. Winders selected a benefit payable in the "Normal Form" which, by its own definition, means that the monthly payments were guaranteed for at least 60 months. Additionally, the SPD states that Mr. Winders' pension would be paid as follows:

> **HOW WILL MY PENSION BE PAID?**
>
> **The normal form of payment for Normal, Early, or Disability Retirement is a "monthly pension for your lifetime with a minimum of 60 payments guaranteed.** Under this form, if you should die before you receive 60 monthly payments from the Plan, your beneficiary or your estate will receive the remaining unpaid installments . . .**

(JR-0072) (emphasis added).

Both the Plan and the SPD compel the conclusion that, when Mr. Winders completed the application selecting UER benefits, he elected a "monthly" payment form and that those monthly payments would be paid to him in the "Normal Form," which means a guarantee of 60 monthly installments.

In denying Mr. Winders' claim for monthly benefits, Defendant relies heavily on its contention that Mr. Winders did not complete the application process, asserting that additional action was required by Mr. Winders. (Memorandum in Opposition at p. 2). To this end, the Magistrate Judge concluded that Mr. Winders was informed that "the application process normally took 60 days to obtain **the necessary information to calculate the benefit amount."** (Report and Recommendation at p. 5, citing JR-0112 (emphasis added). However, the Plan was in receipt of all of the information required to calculate benefits, as evidenced by its letter to him

dated July 6, 2001 in which the Plan enclosed only a beneficiary card for completion "to ensure proper beneficiary information and other personal data." (JR-0112).

Thus, there is not a 60 day waiting period as Defendant contends. Rather, there is a process to obtain information required to calculate the benefit. Although the benefit calculation remained to be done, the Plan was in receipt of all required information to "calculate benefits" and merely enclosed a beneficiary card the purpose of which was to confirm "information and other personal data," which was not necessary to the calculation of benefits. Accordingly, the Plan's contention that it has a 60 day period to approve an application is without support in the Plan or the SPD. By the Plan's own admission, the 60 days is required "to obtain all of the information needed to calculate the benefits." (JR-0112).

In contradiction to Mr. Winders' election of a "monthly" benefit to be paid in the Normal Form, i.e., a guaranteed term of 60 months, the Plan Administrator concluded that Mr. Winders was to receive a lump sum payment. (JR-0092). The Plan Administrator stated that his decision was supported by Sections 7.03 and 7.05 of the Plan (JR-0149). However, neither of these sections support the determination that Mr. Winders was only entitled to receive a lump sum payment.

To this end, Section 7.03 envisions two potential scenarios. First, if the Participant has "satisfied all requirements" for a benefit to commence, including the completion of an application in which a payment form is elected, then the Participant's beneficiary "shall" have the option of receiving either a monthly payment or a lump sum payment.

The effect of the first option is that the Plan Administrator has no discretion in determining the type of benefit as the decision is left to the beneficiary by the mandatory language "shall." Second, where a Participant has not satisfied all of the requirements for a

benefit to commence, including an application electing a payment form, then payment shall be made "in accordance with the remaining provisions of . . . Article No. 7 as if the Participant had died prior to retirement . . ."  In this scenario, the issue is whether the Participant "satisfied all requirements" for a benefit to commence including the completion of an application in which a payment form is elected.  If that is the case, the Plan is obligated to honor Mr. Winders' decision to receive monthly payments for a guaranteed term of 60 months.

In either event, the express language of Section 7.03 supports the payment of monthly benefits to Mr. Winders.  However, Defendant contends that the first scenario is not applicable to Mr. Winders, because a payment form was not elected.  However, Defendant overlooks the language in Mr. Winders' application.  In that application, he elected a "payment form" when he elected to receive UER benefits which is expressly defined as a "monthly" benefit.  (JR-0025).  Under Section 5.02(b), the "monthly" benefit is to be paid in the "Normal Form," which means a guarantee of 60 monthly installments.  (Section 1.19; JR-0012).  The election of this UER benefit occurred before Mr. Winders' death and the Plan was obligated to honor his beneficiary's election to receive monthly payments.

The Plan Administrator also relies upon Section 7.05 in requiring a lump sum installment payment.  However, Section 7.05 only applies where the Participant dies before "actual retirement."  (JR-0038).  Neither the term "retirement" or "actual retirement" is defined by the Plan.  However, the application form asks the Participant to identify the "last day worked as an operating engineer."  (JR-0095).  In this case, Mr. Winders indicated that his "last day worked" was June 28, 2001.  The Board of Trustees affirmed the Plan Administrator's decision that Mr. Winders was not "retired" despite the fact that he clearly identified his last day of work.  (JR-

0166). It is difficult to envision how one can identify his "last day worked" but be determined not to be "retired," as the terms are mutually exclusive.

Defendant asserts that Mr. Winders worked 40 hours in July, 2001 in support of its contention that Mr. Winders was not "retired." As stated above, the "Matched Pension Hours" document relied upon by Defendant does not mean that Mr. Winders actually worked, rather, it reflects that Mr. Winders was paid in July for work performed in June, 2001. (JR-0100; Winders, ¶ 8). Clearly, Mr. Winders was indeed "retired" at the time of his death.

Resolution of the dispute over Mr. Winders' last day of work should not be necessary since Article 4 of the Plan, which governs "Eligibility for Retirement Benefits," states that payment of retirement benefits commences "on the first day of any month following the month in which a Participant's application for his normal retirement benefit is received and approved by the Fund Administrator." (Section 4.01; JR-0020). Comparable language is used with respect to UER. (Section 4.02; JR-0020-0022). Thus, by the express language of the Plan, the event from which eligibility is measured is submission of the application, not the cessation of all work. It is undisputed that Mr. Winders submitted his application in June, 2001. Further, Mr. Winders performed no work in July, 2001 as he was only being paid for work done the preceding week.

### III.  ARGUMENT

    **A.  The Court erred in not applying the *de novo* standard of review as the Plan requires no "interpretation" or "construction" to determine that Mr. Winders selected monthly UER benefits; and, to the extent that "interpretation" or "construction" were necessary, such discretion would only apply to the Plan instrument itself, and not to collateral evidence.**

The Magistrate Judge relied upon Section 9.02 of the Plan in determining that the Plan granted discretionary authority to the Administrator, thereby triggering the arbitrary and

capricious standard of review. However, Section 9.02 grants discretion only to "construe and interpret the Plan, decide all questions of eligibility and determine amounts, manner, and time of payment of any benefits hereunder …." In this instance, the Plan is not in need of construction or interpretation in determining Mr. Winders' election of monthly UER benefits.

Section 7.03 mandates that, where the participant has satisfied the requirements for a benefit to commence and has completed an application in which a payment form is elected, the beneficiary "shall" have the option to receive the benefits in the manner elected. The term "shall" in the Plan presents the Administrator with a mandatory, not discretionary, obligation. See, e.g., State ex rel. Bothinks v. Laws, 69 Ohio St.3d 383, 632 N.E.2d 897 (1994); Stephan v. State Veterinarian Medical Board, 113 Ohio App. 538, 173 N.E.2d 389 (1960); see also, Webster's Third New International Dictionary (unabridged), 1996. Construction or interpretation is, thus, unnecessary. See, e.g., Matthews v. Sears Pension Plan, 144 F.3d 461, 466 (7th Cir. 1998); Curry v. Colonial Life Insurance Co., 737 F. Supp. 847 (E.D. Pa. 1990).

While the Plan language certainly may be said to grant discretion with respect to interpretation and construction, such grant necessarily assumes that interpretation or construction is needed. There is simply no application of those discretionary principles to this case. To hold otherwise would allow the Administrator to simply ignore the terms of the Plan on the premise that he has discretion to "interpret" it.

Further, in determining that Mr. Winders was not entitled to monthly benefits, the Plan Administrator construed the application submitted by Mr. Winders by determining that he did not elect a benefit, and the "Matched Pension Hours" document in determining that he was not retired. Thus, the Administrator was not construing the Plan, Rather, he was construing collateral evidence. See, Hogan v. Raytheon, 302 F.3d 852, 856 (8th Cir. 2002) (holding that

8

interpretation of a divorce decree was not subject to grant of discretionary authority); Samaroo v. Samaroo, 193 F.3d 185, 189 (3d Cir. 1999) (holding that trustee must be interpreting terms of the instrument itself); Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606, 611 (5th Cir. 1999) (holding that Court should review decision by administrator finding a property settlement agreement to be a QDRO *de novo* since it involved principles of statutory construction and interpretation of the agreement, not interpretation of the plan).

As in Dial v. NFL Player Supplemental Disability Plan, *supra,* the Court must review the Plan Administrator's construction of the "Matched Pension Hours" document and Mr. Winder's application *de novo* as the a grant of discretion, if any, would apply only to the Plan instrument itself. The legal conclusion that Mr. Winders was not "retired" must be reviewed *de novo*. See, Penn v. Howe-Baker Engineers, Inc., 898 F.2d 1096, 1100 (5th Cir. 1990) (reviewing administrator's determination as to whether an employee was an independent contractor *de novo*).

   **B.**  **The Plan's decision to deny monthly benefits was irrational in light of the express terms of the Plan under either standard of review.**

Even applying the arbitrary and capricious standard of review, the decision on review must still be "rational in light of the plan's provisions." Spangler v. Lockheed Martin Energy Systems, Inc., 313 F.3d 356, 361 (6th Cir. 2001) (citing, Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989)); see also, Perez v. Aetna Life Insurance Co., 150 F.3d 550, 555 (6th Cir. 1998) (en banc).

Defendant contends that its decision denying monthly benefits is rational upon its determination that Mr. Winders did not elect a payment form. (Memorandum in Opposition at p. 14). In support it states, "[o]f most importance, Plaintiff's father never completed a new

9

beneficiary card … and he never made an election as to the form of pension payments." (Memorandum in Opposition at p. 15). However, as explained above, the purpose of the beneficiary card, by Defendant's own admission, was merely "to ensure proper beneficiary information and other personal data." (JR-0112). The routine clerical function of the beneficiary card cannot rationally be said to have reversed Mr. Winders' completed and tendered application.

With respect to the election of form of payment, Defendant contends that no election was made. To this end, Mr. Winders checked the first of the six available options, i.e., "Unreduced Monthly Retirement, age 61 but prior to age 65." (JR-0095). By electing UER benefits under Section 5.02(b), Mr. Winders clearly elected to receive a "monthly" benefit. Further, Section 5.02(a), which governs UER benefits when elected after age 62, also indicates that it is a "monthly payment" (JR-0025). By electing "monthly" UER benefits, Mr. Winders selected a benefit payable in the "Normal Form" which, by its own definition, means that the monthly payments were guaranteed for at least 60 months.

Instead of recognizing Mr. Winders' election of monthly benefits, Defendant instead states that Mr. Winders was required to complete additional forms confirming his election and that he may have changed his election within 90 days. (Memorandum in Opposition at p. 14). However, it is irrational for the Administrator to summarily conclude, without any other information, that Mr. Winders would in the future change his previously elected form of payment: UER benefits.

The decision of the Administrator implies an assumption, that Mr. Winders may have elected a different form of payment in the future, in contradiction to Mr. Winders' election as

expressed on the completed application form. Under any standard of review, this decision is not rational.

### C.    Plaintiff is entitled to monthly payments under the SPD.

Mr. Winders' election of monthly UER benefits is mandated by the SPD which, in describing the normal form of payment, states: "[u]nder this form, if you should die before you receive 60 monthly payments from the Plan, your beneficiary or your estate will receive the remaining unpaid installments." (JR-0072). While providing that, if the participant dies before receiving 60 monthly payments, the beneficiary "will" receive the remaining installments even if all 60 are unpaid, the SPD also states that the participant can "elect" the Contingent Annuitant option as another form of payment. (JR-0073). Thus, the Contingent Annuitant option applies only if specifically elected, while the Normal Form otherwise prevails.

The SPD must be "written in a manner calculated to be understood by the average plan participant and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the Plan...." 29 U.S.C. §1022(a). It is the "plain language" mechanism for informing plan participants of the terms of the plan and its benefits. Hicks v. Flemming Companies, 961 F.2d 537, 539-540 (5th Cir. 1992).

The Sixth Circuit has clearly emphasized the importance of the SPD in determining the meaning of the Plan. In Edwards v. State Farm Mutual Automobile Insurance Company, 851 F.2d 134 (6th Cir. 1988), the Court held that statements made in SPDs are binding and, if they conflict with statements made in the Plan itself, the SPD controls. Id., at 136. Thus, Defendant is bound by the statements made in the SPD.

Defendant contends that SPD and Plan do not conflict. (Memorandum in Opposition at p. 16). Assuming *arguendo* that this is accurate, Defendant would still be bound by its

statements in the SPD. Defendant misconstrues Edwards v. State Farm Mutual Automobile Insurance Company, *supra*, to require a conflict to give meaning to the terms of the SPD. However, such is not the case as the SPD will control when in conflict with the Plan but, in any event, Defendant will be bound by the statements in the SPD. Id. at 136 ("statements in a summary plan are binding **and** if such statements conflict with the plan itself, the summary shall govern) (emphasis added).

Here, there is no existence of a conflict. The SPD plainly states that UER benefits will be a monthly pension benefit payable for the employee's lifetime, "with a minimum of 60 payments guaranteed." The SPD states that "if you should die before you receive 60 monthly payments from the Plan, your beneficiary or your estate will receive the remaining unpaid installments."

In the face of these statements Defendant contends that its subsequent statement that it "takes approximately 60 days to process applications" for UER somehow clarifies the previous statements and appending the entire Plan to the SPD absolves it of the SPD statements. This ignores two points. First, the SPD clearly envisions the payment of monthly benefits even if all 60 remain unpaid. To accept Defendant's contention that it has to completely process and application would preclude any scenario where all installments could remain unpaid.

Second, merely appending the Plan instrument to the SPD cannot be used as a tool to circumvent the statements made in the SPD. Defendant's authority does not stand for that proposition. In Lake v. Metropolitan Life Insurance Co., 73 F.3d 1372 (6th Cir. 1996), the court held that there was merely ambiguous language in the SPD, it will not trump the unambiguous terms of the plan. Id. at 1379. Here, the SPD is not ambiguous, Mr. Winders is entitled to UER benefits payable for his lifetime, "with a minimum of 60 payments guaranteed."

IV. **CONCLUSION**

Based upon the foregoing, it is respectfully submitted that the Magistrate Judge erred in granting judgment on the record in favor of the Defendant. The Plan and SPD do not mandate the arbitrary and capricious standard of review and the application of that standard resulted in an erroneous conclusion. Mr. Winders clearly elected UER benefits which are payable "monthly" in the "Normal Form" meaning Mr. Winders was entitled to a guaranteed term of 60 installments, as opposed to a lump sum payment.

Respectfully submitted,

s/ Randy J. Blankenship
Randy J. Blankenship (#0034594)
Daniel J. Temming (#0030364)
Attorneys for Plaintiff
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio 45202-2417
TEL:      (513) 721-3330
FAX:      (513) 721-5001
E-MAIL:   rblankenship@rkpt.com
          dtemming@rkpt.com


s/ Anthony J. Gertz
Anthony J. Gertz (#0008226)
Attorney for Plaintiff
Gertz & Gertz, L.P.A.
401 Pike Street
Reading, Ohio  45215
TEL:      (513) 554-1868
FAX:      (513) 554-1897
E-MAIL:   agertz@gertzlaw.com

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a copy of the foregoing has been furnished to Thomas M. Tarpy. Scott A. Carroll, and David A. Campbell, Vorys, Sater, Seymour and Pease LLP, P.O. Box 1008, 52 East Gay Street, Columbus, Ohio 43215-1006, by electronic mailing, via the Clerk's Office, this 6th day of November, 2003.

                                                  s/ Randy J. Blankenship
                                                  Randy J. Blankenship

P:\RKPT\Data\wp\Mike\L2728 0001 (Reply Brief to Memo in Opp to Motion for Review of Mag. Report . ..).doc